786 F.Supp. 258 (1992)
UNITED STATES of America
v.
Ted W. GLEAVE and David R. Knoll, Defendants.
No. CR-90-33S.
United States District Court, W.D. New York.
January 28, 1992.
*259 *260 *261 Dennis C. Vacco, U.S. Atty. by Denise O'Donnell, Asst. U.S. Atty., Buffalo, N.Y., for U.S.
Thomas P. Cleary, Joel L. Daniels, Buffalo, N.Y., for Gleave.
David R. Knoll, pro se.
Robert J. Riordan, Kenmore, N.Y., for Knoll.

DECISION AND ORDER
SKRETNY, District Judge.

INTRODUCTION
On February 22, 1990, the United States of America (hereinafter "the government") filed a forty-six count Indictment against the defendants Ted W. Gleave ("Gleave") and David R. Knoll ("Knoll") (collectively referred to as "the defendants"). The indictment charges the defendants with conspiracy (18 U.S.C. § 371); concealment of assets in bankruptcy (18 U.S.C. § 152); making false statements to a department of the United States (18 U.S.C. § 1001); money laundering (18 U.S.C. § 1956); and interstate transportation of monies obtained by fraud (18 U.S.C. § 2314).
Now before this Court are several motions of Gleave and Knoll to dismiss various counts of all or portions of the indictment and to suppress evidence, all pursuant to Fed.R.Crim.P. 12(b). Specifically, *262 the motions of defendants addressed herein are as follows:
(1) The defendants move to dismiss Counts Seven and Eight of the indictment, arguing that they are impermissibly duplicitous.
(2) Knoll also moves to dismiss Count One on duplicity grounds.
(3) Knoll moves to dismiss Counts Four, Five and Six, arguing that those counts are barred by the statute of limitations.
(4) The defendants move to dismiss Counts Nine through Thirty-Three of the indictment arguing that the Money Laundering Control Act of 1986, 18 U.S.C. § 1956, the statute on which those counts are charged, is unconstitutional. Knoll also argues that this Court must dismiss Counts Nine through Thirty-Three because, according to Knoll, the conduct which those counts charge does not violate § 1956.
(5) The defendants move to dismiss Counts Thirty-Five through Forty-Six of the indictment on the grounds that those counts are legally insufficient. Counts Thirty-Five through Forty-Six charge the defendants with violations of the National Stolen Property Act, 18 U.S.C. § 2314. Specifically, the defendants argue that the alleged stolen property was part of a bankruptcy estate in Chapter 11 where, according to the defendants, Gleave maintained title ownership of the property. Therefore, the defendants contend, Counts Thirty-five through Forty-six do not charge that the defendants' alleged conduct deprived another of an ownership interest in property.
(6) The defendants move for an Order excluding as evidence certain bank records from Barclays Bank International, Ltd. Grand Cayman, Cayman Islands. The government seeks to introduce the foreign bank records pursuant to 18 U.S.C. § 3505.
(7) Knoll moves to dismiss the entire indictment against him on the grounds of prejudicial pre-indictment delay.
(8) Daniel Nowak, a witness called by the defense at a suppression hearing in this case, seeks an Order form this Court requiring that the government pay him witness fees pursuant to 28 U.S.C. §§ 1821 and 1825.
(9) Finally, the defendants move to suppress certain physical evidence.
This Court shall address each motion in turn and, for the reasons stated below, denies the defendants' motions. This Court also denies Daniel Nowak's request for witness fees.[1]

FACTS
In August 1982, Gleave individually, and his corporation, 747 Kenmore Avenue, Inc., filed Chapter 11 bankruptcy petitions which commenced the following two bankruptcy cases: In Re Ted W. Gleave, BK. No. 82-12238, and In Re 747 Kenmore Avenue, Inc., BK. No. 82-12256M. On January 12, 1984, the Bankruptcy Court ordered the two bankruptcy cases converted to liquidation proceedings under Chapter 7 of the Bankruptcy Code (hereinafter collectively referred to as "the bankruptcy proceedings").
The central thrust of the indictment is that the defendants entered into a conspiracy to conceal assets, in excess of $600,000.00, from the trustee and creditors in the bankruptcy proceedings.
Count One, charging conspiracy under 18 U.S.C. § 371, details the alleged agreement between Knoll and Gleave to commit various criminal acts. According to the indictment, Gleave, aided and abetted by Knoll, concealed assets from the trustee and creditors in the bankruptcy proceedings, and laundered the monies, initially through two bank accounts in the Cayman Islands and then transferring the monies to banks in Canada, and the United States. According to the indictment, the defendants used these monies, once laundered, to repurchase real estate which Gleave owned prior to the bankruptcy proceedings and to conduct *263 other business and real estate transactions through various corporate entities.
Counts Two through Five charge the defendants with bankruptcy fraud violative of 18 U.S.C. § 152, by virtue of their alleged concealment of assets from the trustee and creditors in the bankruptcy proceedings and, in connection with these alleged acts, their submission of false financial statements submitted in the Ted W. Gleave, BK. No. 82-12238, bankruptcy proceeding.
Counts Six through Eight charge the defendants with falsely representing to the United States Probation Service and the United States Department of Justice, in violation of 18 U.S.C. § 1001, that Gleave was without substantial financial assets, although, according to the indictment, Gleave along with Knoll maintained bank accounts in the Cayman Islands.
Counts Nine through Thirty-Three charge the defendants with money laundering violative of 18 U.S.C. § 1956, by conducting financial transactions affecting interstate and foreign commerce, involving the proceeds of monies concealed in the Caymanian bank accounts from the trustee and creditors in the bankruptcy proceedings, knowing the transactions designed to conceal the nature, location, source, ownership and control of the proceeds.
Count Thirty-four, charging the criminal forfeiture statute, 18 U.S.C. § 982, seeks forfeiture of certain properties allegedly placed beyond the jurisdiction of this Court and other assets which the government charges are traceable to the money laundering transactions allegedly engineered by the defendants.
Counts Thirty-five through Forty-six charge the defendants with interstate transportation of monies taken by fraud violative of 18 U.S.C. § 2314, by virtue of the defendants' transfers of the monies concealed from the bankruptcy proceedings in interstate and foreign commerce to the Caymanian bank accounts.
All Counts also charge aiding and abetting under 18 U.S.C. § 2. The government's theory is that, at minimum, each defendant aided and abetted the other's criminal conduct.

DISCUSSION

I. The Defendants' Motions To Strike Counts Seven And Eight As Duplicitous

The defendants move to dismiss Counts Seven and Eight of the indictment on the grounds that those counts are impermissibly duplicitous under Fed. R.Crim.P. 7(c).
Counts Seven and Eight charge the defendants with making fraudulent statements in two separate documents (collectively referred to as "the documents") submitted to the Department of Justice in violation of 18 U.S.C. § 1001. Specifically, those counts charge that Gleave, "... aided, abetted, counseled, commanded, induced and procured ..." by Knoll, did "... conceal and cover up by trick, scheme and devise material facts and make false, fictitious and fraudulent statements and representations in a matter within the jurisdiction of the Department of Justice ..." in violation of 18 U.S.C. § 1001. Count Seven alleges that the offense occurred on October 30, 1986 in an "Examination of Judgment Debtor (Form W351)" ("Form W351"). Count Seven contains nine questions from the Form W351 and the allegedly false answers supplied by the defendants to each of these nine questions. Count Eight alleges that the offense occurred on June 2, 1987 in a "Financial Statement of Debtor" form. Count Eight contains seven questions from the "Financial Statement of Debtor" and the allegedly false answers supplied by the defendants to each of these seven questions.
Moving for dismissal of Counts Seven and Eight, the defendants contend that each count is not one offense but actually nine and seven separate offenses, respectively. Defendants argue that any one of the allegedly false answers would establish the offense under 18 U.S.C. § 1001 and, therefore, proving the falsity of each statement would involve evidence of dissimilar facts, a prospect which, according to the *264 defendants mandates dismissal of Counts Seven and Eight.
Opposing the defendants' motions, the government contends that Counts Seven and Eight do not each contain several separate offenses but instead, as authorized by Fed.R.Crim.P. 7(c)(1), each count "... charges but a single offense which is alleged to have been committed by multiple means as part of a single scheme...." Along these lines, the government argues that Counts Seven and Eight "... merely set forth different means by which fraudulent statements were made to the Department of Justice...."
Duplicity is the joinder of two or more distinct offenses in a single count. It is a rule of pleading and "... would in no event be fatal to the count." United States v. Droms, 566 F.2d 361, 363, n. 1 (2d Cir. 1977); United States v. Duncan, 850 F.2d 1104, 1108, n. 4 (6th Cir.1988).
Not every count which charges multiple acts, any one of which could alone constitute a separate offense and be charged in a separate count, is duplicitous. The Advisory Committee notes accompanying Fed.R.Crim.P. 7(c) emphasize that the framers of the rule "... intended to eliminate the use of multiple counts for the purpose of alleging the commission of the offense by different means or in different ways." Therefore, two or more acts, each which alone could be charged as a separate offense in a separate count, may be charged in a single count if "... those acts could be characterized as part of a single continuing scheme." United States v. Shorter, 608 F.Supp. 871, 876 (D.D.C.1985), aff'd, 809 F.2d 54 (D.C.Cir.1987), cert. denied, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 35 (1987); see United States v. Droms, 566 F.2d 361, 363 (2d Cir.1977) ("... Fed. R.Crim.P. 7(c)(1) permits allegation in a single count that an offense has been committed in a multiplicity of ways....").
In this case, therefore, even if each of the allegedly false statements made in the two documents standing alone could be charged in separate counts, if the statements contained in any one count "... are part of a single continuing scheme ..." with respect to that count, the government may, as it has done in this case, properly charge them in a single count.
In determining whether a single offense or separate offenses are charged, this Court consults the language of the statute and the legislative intent of Congress, if any can be discerned. If legislative intent is ambiguous, "... the rule of lenity prescribes that doubt will be resolved against turning a single transaction into multiple offenses, and therefore in favor of combining multiple factual predicates into the same count." United States v. Duncan, 850 F.2d at 1108 (citing Bell v. United States, 349 U.S. 81, 83-4, 75 S.Ct. 620, 622-23, 99 L.Ed. 905 (1955)). See 1 Charles A. Wright, Federal Practice & Procedure, § 142 ("Unless Congress has indicated clearly that it contemplates separate crimes doubt will be resolved against turning a single transaction into multiple offenses.")
It is true that proving the falsity of each statement would require proof of somewhat dissimilar facts. It is also true that the falsity of any one answer would constitute a violation. However, this Court finds that the multiple acts charged in Counts Seven and Eightthe alleged false answers supplied by the defendants on the two respective documentsare part of a single alleged scheme to defraud the government.
18 U.S.C. § 1001, makes it unlawful to defraud "any department or agency of the United States" via concealment or affirmative representation with respect to any matter within the jurisdiction of any department or agency of the United States. On its face, the statute targets the act of defrauding the government through any one of various means and does not suggest a congressional intent to constitute more than one offense. See United States v. UCO Oil Co., 546 F.2d 833, 836 (9th Cir. 1976), cert. denied, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977) (18 U.S.C. § 1001 "... is directed at a single evil, i.e. the `perversion' of `the authorized functions of governmental departments and agencies ... which might result from the deceptive practices described.'") (quoting *265 United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941)).
In United States v. Berardi, 675 F.2d 894, 897 (7th Cir.1982), the Seventh Circuit affirmed the district court's denial of the defendant's motion to dismiss the indictment on duplicity grounds. In that case, charging the defendant with obstruction of justice for attempting to influence grand jury testimony, the government utilized a single count containing three separate instances of corrupt influence, any one of which could sustain a single count. The Court said:
[t]he three acts of obstruction ... could have constituted independent violations ... and could have been charged in separate counts. Had the government taken this route, of course, Berardi would have been subjected to multiple statutory penalties. The government, however, declined this opportunity to cumulate these punishments and the indictment, fairly interpreted, charges Berardi with a continuing course of conduct, during a discrete period of time....
Id., at 898. The Seventh Circuit found the government's characterization of the facts as a single continuing offense "... fair ... under the circumstances ..." particularly because the obstruction of justice statute contemplates "... a continuing course of conduct." Id. See United States v. Mangieri, 694 F.2d 1270, 1282 (D.C.Cir.1982) (Court held not to be duplicitous a count alleging multiple false statements made to a lending institution on a single loan application in violation of 18 U.S.C. § 1014; statute targeted "... fraudulent loan transactions, rather than the particular falsehoods used to achieve the illegal transaction.") (emphasis in original).
Just as in Mangieri which addressed 18 U.S.C. § 1014, this Court concludes that in enacting 18 U.S.C. § 1001, Congress targeted the act of defrauding the federal government and not the particular falsehoods used to achieve the fraud.
Finally, the defendants argue that submission of Counts Seven and Eight to the jury, as is, may confuse the jury to the extent the jury is unable to agree upon which statements were false. However, this Court concludes that the prospect of confusion amongst the jury can be remedied by an appropriate jury instruction. See, e.g., United States v. Finley, 705 F.Supp. 1272, 1295 (N.D.Ill.1988) (Court utilized jury charge requiring jurors to unanimously agree on which offenses were committed to safeguard against juror confusion).
Therefore, this Court denies the defendants' motions to dismiss Counts Seven and Eight as duplicitous.

II. Knoll's Motion To Dismiss Count One As Duplicitous[2]
In Count One, the indictment charges Knoll with conspiracy to commit an offense against the United States under 18 U.S.C. § 371. Count One alleges several underlying offenses allegedly committed by means of the alleged conspiracy, including offenses under 18 U.S.C. §§ 152, 1001, 1956 and 2314. Knoll argues that the "... government may only charge one crime in each count so that the jury can properly focus on each claim without becoming confused."
Under 18 U.S.C. § 371, the conspiracy itself is the crime, not the underlying offenses committed via the conspiracy. A single conspiracy count under 18 U.S.C. § 371 may allege several crimes committed by means of the conspiracy. See Braverman v. United States, 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942) ("The *266 allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for `The conspiracy is the crime, and that is one, however diverse its objects.'") (citations omitted).
Therefore, this Court denies Knoll's motion to dismiss Count One as duplicitous.

III. Knoll's Motion To Dismiss Counts Two, Four, Five and Six As Barred By The Statute of Limitations

Counts Two, Four and Five charge Knoll with aiding and abetting the concealment of Gleave's assets and the assets of 747 Kenmore Avenue, both bankruptcy debtors, in violation of 18 U.S.C. §§ 2 and 152. Count Six charges Knoll with aiding and abetting Gleave's false material statements to the United States Probation Service in violation of 18 U.S.C. §§ 2 and 1001.
Knoll argues that where the government charges aiding and abetting, as it has done in Counts Two, Four, Five and Six here, the statute of limitations begins to run when the particular acts of aiding and abetting took place. Because, Knoll argues, the acts of aiding and abetting in Counts Two, Four, and Five are alleged to have been accomplished by Knoll "... on or about July 28, 1982 ..." and the acts of aiding and abetting in Count Six are alleged to have taken place "... about April 14, 1983 ...,"[3] these are time barred by the five year general statute of limitations contained at 18 U.S.C. § 3282.
This Court rejects Knoll's argument. 18 U.S.C. § 2, the aiding and abetting statute charged in Counts Two, Four, Five and Six is not a separate substantive crime but it "... makes punishable as a principal one who aids or abets the commission of a substantive crime." United States v. Campbell, 426 F.2d 547, 553 (2d Cir.1970). In Campbell, the Second Circuit, rejecting the same argument Knoll makes here, held a defendant charged with aiding and abetting was not subject to the five year statute of limitations under 18 U.S.C. § 3282 but was instead subject to the six year limitation period supplied by the substantive crime. See United States v. Oates, 560 F.2d 45, 55 (2d Cir.1977) ("... one who aids and abets the commission of a crime is not only punishable as a principal but is a principal.") (emphasis in original).
18 U.S.C. § 3282 by its own terms may be modified "... as otherwise expressly provided by law." See U.S. v. Heinze, 361 F.Supp. 46 (D.Del.1973). In this case, 18 U.S.C. § 3282 must be read in conjunction with 18 U.S.C. § 3284 which provides:
The concealment of assets of a debtor in a case under Title 11 shall be deemed to be a continuing offense until the debtor shall have been finally discharged or a discharge denied, and the period of limitations shall not begin to run until such final discharge or denial of discharge.
Gleave did not receive a discharge in bankruptcy until September 8, 1986. The government filed the indictment on February 22, 1990, well within the five year statute of limitations which did not begin to run until Gleave's discharge in September 1986.
Therefore, this Court denies Knoll's motion to dismiss Counts Two, Four, Five, and Six on statute of limitations grounds.

IV. The Defendants' Motions To Dismiss Counts Nine Through Thirty-three On The Grounds That 18 U.S.C. § 1956 Is Unconstitutional

Counts Nine through Thirty-Three of the indictment charge that the defendants violated 18 U.S.C. § 1956(a)(1)(B)(i) ("§ 1956")[4], which provides:

*267 (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ...
(B) knowing that the transaction is designed in whole or in part
(i) to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity
. . . . .
shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than 20 years, or both.[5]
The defendants attack the constitutionality of § 1956 on essentially three grounds: A) that the statute is overbroad; B) is vague; and C) lacks an adequate mens rea requirement. This Court now addresses each in turn.

A. Overbreadth
The defendants challenge § 1956 as unconstitutionally overbroad because, according to the defendants, it suppresses a citizen's right to freedom of association within the First Amendment. Specifically, the defendants argue that § 1956 discourages a person from doing business with another whom the person "... even suspects ... is a criminal ..." because criminal liability under the statute may result. The defendants also contend that a person could be subject to civil liability for terminating business with another whom the person "vaguely suspects" of engaging in criminal activity.
This Court rejects the defendants' argument. Criminal liability under § 1956(a)(1)(B)(i) requires proof that a defendant "knows" the property involved in the financial transaction represents "... proceeds of some form of unlawful activity ..." and that the defendant "knowing ... that the transaction is designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity." Therefore, to establish § 1956(a)(1)(B)(i) liability in this case, the defendants must be proven to have known, not merely to have suspected as the defendants argue, that they conducted or attempted to conduct a financial transaction with the proceeds of unlawful activity.
The defendants also argue that § 1956 is overbroad because "... guilt may be inferred from [a defendant's] willful blindness" to the fact that a defendant conducts business with the proceeds of unlawful activity. However, this Court agrees with the Government that "... criminal knowledge under § 1956 may include instances of `willful blindness,'" but, even in that case, the Government still must prove defendants were on notice of a high probability of the existence of a fact. United States v. Gurary, 860 F.2d 521, 526 (2d Cir.1988), cert. denied, 490 U.S. 1035, 109 S.Ct. 1931, 104 L.Ed.2d 403 (1989) (conscious avoidance satisfies knowing intent requirement where the matter involves existing facts) (and discussion therein); See United States v. Ortiz, 738 F.Supp. 1394, 1400, n. 3 (S.D.Fla.1990) (rejecting defendant's argument that a possible application of the "willful blindness" doctrine to prosecutions under § 1956 renders the statute void for vagueness).
Finally, this Court finds unavailing the defendants' argument that § 1956 is overbroad because it may expose to civil liability persons discouraged from doing business with another whom the person suspects might deal in proceeds of unlawful activity. This vague argument, unsupported by any case law which this Court can locate or which the defendants have provided, is speculative at best and, more importantly, does not establish any unconstitutional overbreadth of § 1956. See United States v. Mainieri, 691 F.Supp. 1394, 1397 (S.D.Fla.1988) (§ 1956 does not implicate constitutionally protected conduct).
*268 The defendants do cite Ricci v. Key Bancshares of Maine, Inc., 662 F.Supp. 1132 (D.Me.1987). Ricci, however, remains easily distinguishable. In that case, the plaintiffs alleged that the defendant terminated a lending relationship with the plaintiffs based on allegations, heard by the defendant, connecting one plaintiff to organized crime. A jury found the defendant liable under the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f, for discriminating against the plaintiffs due to one plaintiff's national origin and for failing to provide a timely written statement of reasons for terminating a banking relationship under the statute. The defendant was also found liable for intentional infliction of emotional distress under state law.[6]Ricci simply does not stand for the proposition for which the defendants cite it and merits no further discussion.
Therefore, this Court denies the defendants' motions to dismiss Counts Nine though Thirty-Three of the indictment on the grounds that § 1956 is unconstitutionally overbroad.

B. Vagueness
Next, the defendants argue that § 1956 is unconstitutional because it has an "... insufficient knowledge requirement ..." and therefore is unconstitutionally vague. In making this argument the defendants focus on the language of § 1956(a)(1), providing that:
Whoever, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity....
Specifically, the defendants argue that under § 1956(a)(1)
... a defendant need not know exactly what crime generated the monies involved in a transaction, but only that the funds are the proceeds of some crime. Such standard is impermissibly vague.... By use of the inherently vague term `some', § 1956 fails to provide sufficient notice of what circumstances may justify an inference of guilty knowledge....
To establish that § 1956 is unconstitutionally vague, the defendants must establish that the statute does not
... define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. ... Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement ... the more important aspect of the vagueness doctrine `is not actual notice, but the other principal element of the doctrine  the requirement that a legislature establish minimal guidelines to govern law enforcement.'
Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (quoting Smith v. Goguen, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (further citations omitted)).
Because this Court concludes, as discussed above, that § 1956 implicates no constitutionally protected conduct, this Court only upholds the defendants' challenge on vagueness grounds "... if the [statute] is impermissibly vague in all its applications." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). Restated, the defendants must "... establish that no set of circumstances exists under which the [statute] would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (Bail Reform Act held facially valid.).
Initially, however, this Court must examine the defendants' vagueness challenge against the particular facts of this case, because if § 1956 clearly proscribes the defendants' alleged conduct, the defendants may not challenge the vagueness of the statute. Village of Hoffman Estates, 455 U.S. at 495, 102 S.Ct. at 1191; Parker v. Levy, 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974).
*269 Counts Nine through Thirty-Three of the indictment charge that the defendants
... did knowingly and willfully conduct and attempt to conduct, through the use of various monetary instruments and wire transfers, certain financial transactions affecting interstate and foreign commerce which involved the proceeds of a specified unlawful activity, that is, the proceeds of funds concealed from the Trustee and creditors in bankruptcy in violation of Title 18, United States Code, Section 152, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity in the manner set forth in Count One of the Indictment, the allegations of which are incorporated by reference herein, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, as more fully described [herein]....
The indictment then lists the 25 alleged transactions which the government charges violate § 1956.
Based on the plain language of § 1956, compared against the alleged activities of the defendants according to the language of the indictment on its face, this Court concludes that the defendants' alleged conduct is exactly that which the statute proscribes. Therefore, this Court denies the defendants' vagueness challenge to § 1956.
As may be distilled from the plain language of § 1956, to establish a violation of the statute, the government must prove that the defendants conducted or attempted to conduct a financial transaction involving proceeds of specified unlawful activity where the defendants: 1) knew the property involved in the transaction to represent proceeds of unlawful activity; and 2) knew the transaction to be designed "... to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity." This Court concludes that § 1956 defines the offense with sufficient definiteness so that the defendants can understand what conduct the statute prohibits. Furthermore, the statute provides detailed definitions such that "[l]aw enforcement officers are not free to apply the money laundering statute guided solely by their likes and dislikes." United States v. Jackson, 935 F.2d 832, 838-839 (7th Cir.1991) (§ 1956 held not unconstitutionally vague).
These statutory elements have been sufficiently charged in the indictment. The indictment charges that the defendants knowingly and wilfully conducted and attempted to conduct transactions involving the proceeds of specified unlawful activity. The indictment delineates the specified unlawful activity which generated the proceeds: according to separate counts in the indictment, the defendants' alleged concealment of funds from the Trustee and creditors in bankruptcy, in violation of 18 U.S.C. § 152. The indictment then charges that the defendants engaged in the alleged laundering transactions through the use of various monetary instruments and wire transfers, knowing the transactions designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the unlawful activity. Moreover, § 1956(c)(7)(D) defines "specified unlawful activity" as contained in § 1956(a)(1), to include "... an offense under [18 U.S.C.] § 152 (relating to concealment of assets)...." See United States v. Levine, 750 F.Supp. 1433, 1441-42 (D.Colo. 1990) (the Court rejected one defendant's argument that the indictment failed to allege a violation of § 1956(a)(1)(B)(i); specified unlawful activity includes proceeds alleged to stem from the defendant's separate violation of 18 U.S.C. § 152).
Several recent federal cases have rejected similar vagueness challenges to § 1956. United States v. Jackson, supra.; United States v. Sierra-Garcia, 760 F.Supp. 252, 258 (E.D.N.Y.1991); United States v. Ortiz, supra.; United States v. Kimball, 711 F.Supp. 1031, 1034-35 (D.Nev.1989); United States v. Mainieri, supra, 691 F.Supp. at 1396-97.
*270 The defendants also contend that § 1956 is unconstitutionally vague because the term "proceeds" is inadequately defined. Just as other Courts have rejected this contention, so too does this Court.
Where a criminal statute fails to define a term, a court must interpret the term "... as taking [its] ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). In United States v. Ortiz, after surveying the common definitions of the term proceeds, and emphasizing that "... a statute is not facially void for vagueness simply because there might be marginal situations in which the statutory meaning would be questionable[,]" the Court concluded that "... the term `proceeds' has a commonly accepted meaning, and additionally [was] clear in the context ..." of that case. Id., at 1400. This Court agrees with the reasoning of Ortiz and similarly concludes that the term "proceeds" as used in § 1956, and under the facts of this case, is not so vague as to render § 1956 unconstitutional. See United States v. Sierra-Garcia, supra, 760 F.Supp. at 259 (concluding that the term "proceeds" as used in § 1956 is not vague); United States v. Mainieri, supra, 691 F.Supp. at 1397 (same).
Therefore, this Court denies the defendants' motions to dismiss Counts Nine through Thirty-Three of the indictment on the grounds that § 1956 is unconstitutionally vague.

C. Mens Rea
The defendants further argue that § 1956 is unconstitutional because the statute contains no intent requirement and improperly incorporates the doctrine of transferred intent.
For the same reasons that the Court in United States v. Ortiz, supra, 738 F.Supp. at 1401, found these contentions groundless, so too does this Court.
First, § 1956 contains a mens rea requirement: knowledge; a defendant may not be convicted under § 1956(a)(1)(B)(i) unless the defendant conducts or attempts to conduct a financial transaction involving property where the defendant knows the proceeds represent unlawful activity. The defendant must also know "... that the transaction is designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity...."
Second, this Court rejects the defendants' argument that § 1956 improperly incorporates the doctrine of transferred intent. The defendants' liability under § 1956 depends on proof that the defendants, not another individual, knew the proceeds involved in the particular transaction to stem from unlawful activity. Therefore, by the statute's own terms, "[t]his knowledge must be personal to the defendant." United States v. Ortiz, supra, 738 F.Supp. at 1401 (rejecting same transferred intent argument).
Therefore, this Court denies the defendants' motion to dismiss Counts Nine through Thirty-Three of the indictment on the grounds that § 1956 contains an insufficient mens rea.

D. Knoll's Additional Argument That Counts Nine Through Thirty-three Fail To Allege Conduct Violative Of § 1956
Finally, Knoll contends that this Court must dismiss Counts Nine through Thirty-Three because the conduct which those counts charge is not conduct prohibited by § 1956. Specifically, Knoll contends that the defendants accomplished the transactions alleged to violate § 1956 by check or wire transfer and the source of funds for the transactions was not "... concealed or disguised ..." as § 1956(a)(1)(B)(i) requires. Apparently, Knoll contends that the wire transfers and checks indicated the source of funds to be Atlantis International, Inc. and, therefore, no disguise or concealment could be accomplished.
This Court finds Counts Nine through Thirty-Three to clearly charge that the defendants knew the alleged transactions to be designed to "... conceal or disguise the nature, the location, the source, the ownership, *271 or the control of the proceeds of specified unlawful activity" within § 1956(a)(1)(B)(i). The crux of these money laundering counts is that the defendants knew the transactions contained at Counts Nine through Thirty-Three to be designed to conceal assets from the Trustee and creditors in bankruptcy and that such was done though a complex weave of numerous transactions. The fact that the wire transfers and checks referenced that the source of such funds was Atlantis International, Inc., assuming that to be true, is not fatal to the government's theory, charged in Counts Nine through Thirty-Three.
Therefore, this Court denies the defendants' motions to dismiss Counts Nine through Thirty-Three of the indictment.

V. The Defendants' Motions To Dismiss Counts Thirty-five Through Forty-six Charging Violations Of 18 U.S.C. § 2314

In August, 1982, the defendant Gleave and the corporation of which he was president, 747 Kenmore Avenue, Inc. (collectively "the debtors"), filed for bankruptcy. The filing of two Chapter Eleven bankruptcy petitions commenced the following two bankruptcy cases: In re Ted W. Gleave, Bk. No. 82-12238M, and In re 747 Kenmore Avenue, Inc., Bk. No. 82-12256M (collectively referred to as the "bankruptcy proceedings"). On January 12, 1984, the bankruptcy court ordered the bankruptcy proceedings converted to a liquidation proceeding under Chapter Seven of the Bankruptcy Code.
Count One of the indictment, in addition to charging the defendants with conspiracy under 18 U.S.C. § 371, describes the alleged transactions which the government charges violate § 2314.[7] According to Count One, via their conspiracy, the defendants, inter alia, allegedly concealed monies belonging to the bankruptcy estates ("the monies") and placed the monies in bank accounts located in the Cayman Islands in violation of § 2314.
Specifically, Counts Thirty-Five through Forty-Six charge that from about March 22, 1985 through about March 27, 1989, the defendants
... did knowingly and fraudulently cause monies, the value of which exceeded $5,000.00, to be transferred in interstate and foreign commerce, knowing the monies were taken by fraud in the manner set forth in Count One of the Indictment. ...
Counts Thirty-Five through Forty-Six then detail the twelve transactions alleged to violate § 2314.
Section 2314 prohibits, inter alia, interstate transportation of "... any goods, wares, merchandise, securities or money ..." valued to be at least $5,000.00, by individuals "... knowing the [property] to have been stolen, converted or taken by fraud...."
To obtain a conviction under § 2314 the government must prove beyond a reasonable doubt that
... (1) the defendant transported property, as defined by the statute, in interstate commerce, (2) the property was worth $5,000 or more, and (3) the defendant knew the property was `stolen, converted or taken by fraud.'
United States v. Wallach, 935 F.2d 445, 466 (2d Cir.1991) (citing Dowling v. United States, 473 U.S. 207, 214, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985)).
As can be distilled by the statute's plain language, § 2314 only prohibits the interstate transfer of property where the transferor knows "... the [property] to have been stolen, converted or taken by fraud...." As have other federal courts, focusing on the terms "... stolen, converted or taken by fraud ...[,]" the Second Circuit has commented that § 2314 does not ".... reach every form of commercial dishonesty ..." but instead prohibits conduct which deprives another of "... property interests that are `tantamount to ownership.'" United States v. Bennett, 665 F.2d 16, 22 (2d Cir.1981) (quoting United *272 States v. Bunch, 542 F.2d 629, 630 (4th Cir.1976) (per curiam)). In Bennett, the Second Circuit emphasized that § 2314
... has been held inapplicable where the theft or fraudulent taking has not deprived the owner of the goods, or a person having an interest tantamount to ownership, or the perquisites of ownership.
Bennett, 665 F.2d at 22; See United States v. Carman, 577 F.2d 556, 565 (9th Cir.1978) ("Whether the matter be approached from the standpoint of fixing the limits of the words `stolen,' `converted,' or `taken by fraud,' one encounters the requirement [under § 2314] that the `stealing,' `conversion,' or `taking' must be from one having the attributes of an owner.").

A. Section 2314 Applied To The Facts Of This Case
The substance of the § 2314 counts is that the defendants allegedly transferred monies to the Cayman Islands which belonged to and which they concealed from the bankruptcy estates.
The defendants contend that this Court must dismiss Counts Thirty-Five through Forty-Six as legally insufficient because those counts do not charge that the defendants' alleged conduct deprived another of an ownership interest in property.
Although the defendants do not dispute that pursuant to 11 U.S.C. § 541 the filing of the bankruptcy petitions created the bankruptcy estates and that all "legal or equitable interests" of the debtors in property, including the monies, became property of the estates, they argue that the filing of the bankruptcy petitions did not have the legal effect of divesting the debtors of title to the monies. Whatever interest the bankruptcy estates held in the monies, the defendants contend, it was not substantial enough such that the defendants could steal, convert or take by fraud from the estates under § 2314. At most, the defendants argue, Counts Thirty-Five through Forty-Six could establish only that the defendants concealed Gleave's property from creditors in the two bankruptcy proceedings, conduct which does not deprive the property interest of another and, therefore, does not allege a violation of § 2314.
Opposing the defendants' motions to dismiss Counts Thirty-Five through Forty-Six, the government argues that the filing of the petitions "... had the legal effect of divesting Ted W. Gleave of ownership of property of the bankruptcy estates." Therefore, the government argues that the § 2314 counts are legally sufficient.
In support of their argument, the defendants rely on United States v. Carman, supra, 577 F.2d 556, where the Ninth Circuit reversed a defendant's conviction on one § 2314 count. In that case, the indictment charged that the defendant transferred monies interstate knowing the monies to have been converted or taken by fraud upon the creditors of a business which the defendant jointly owned. Just as the defendants have in this case, the defendant there challenged his conviction on the grounds that "... money placed out of the reach of creditors is not the equivalent of money `stolen, converted or taken by fraud' within the meaning of [§ 2314]." Id., at 565.
Agreeing with the defendant, the Ninth Circuit found that the indictment did not charge conduct violative of § 2314 because it failed to allege that the defendant converted or took by fraud property from "... one having the attributes of an owner," a requirement stemming from the terms "stolen," "converted" or "taken by fraud" contained in § 2314. The Court further noted that 18 U.S.C. § 152, which inter alia, prohibits concealment of assets in contemplation of bankruptcy, and the rule of lenity supported a restrained interpretation of § 2314 to the facts of that case. Id., at 565.
In United States v. Levine, 750 F.Supp. 1433 (D.Colo.1990), not cited by either party, the Court, relying on Carman, dismissed several § 2314 counts of an indictment where the government charged, as the government has in this case, that the defendants transferred interstate monies taken by fraud from creditors. In Levine, like this case but unlike Carman, the indictment separately charged the defendants *273 with violations of 18 U.S.C. § 152. Citing the requirement in § 2314 that the subject property be property which the "... defendant obtain[ed] ... from another," the Court concluded that allegations that the defendants "... stole money from their creditors ..." did not constitute conduct violative of § 2314. Id., at 1440.
However, this Court does not choose to follow the results in Carman and Levine under the facts of this case. Initially, in Carman, unlike this case where the allegedly transferred monies were the subject of ongoing bankruptcy proceedings at the time of transfer, the opinion does not indicate that any bankruptcy proceedings with respect to the allegedly transferred property had been initiated before the date of the alleged transfer. It appears from the Carman opinion that the ownership interest in the property allegedly transferred in violation of § 2314 vested with the defendant, and not the defendant's creditors.
Similarly, although in Levine the indictment charged the defendants with bankruptcy fraud in violation of 18 U.S.C. § 152, as the government has charged here, the opinion does not indicate that the § 2314 counts alleged that the defendants transferred interstate monies taken by fraud from creditors after the commencement of bankruptcy proceedings. This point is significant because, as discussed below, the filing of the bankruptcy petition implements the bankruptcy code provisions, which create the bankruptcy estate, define that property which constitutes property of the estate and, most importantly, invests the bankruptcy estate with a property interest which, as discussed below, at minimum has the attributes of an ownership interest.
Moreover, to the extent that the § 2314 counts in Levine charged the defendants with interstate transfer of monies taken by fraud from creditors in bankruptcy, this Court disagrees with the result reached by that Court. The Levine decision contains no explanation of, and it does not appear that the Court considered, the property interests of the bankrupt estate post-petition which, as discussed below, this Court concludes have the attributes of an ownership interest.

B. Bankruptcy Code Section 541
As indicated by the above discussion, this Court concludes that the interest which the bankruptcy estates had in the monies had the attributes of an ownership interest and therefore the § 2314 counts are legally sufficient.
The Bankruptcy Reform Act of 1978, P.L. 95-598, 92 Stat. 2549, created 11 U.S.C. § 541 ("§ 541"), replacing § 70(a) of the former Bankruptcy Act ("70(a)"). Pursuant to § 541, the commencement of a bankruptcy case under either Chapter Seven or Chapter Eleven creates the bankruptcy estate.[8] Section 541 also defines the scope of the debtor's property which is included in the bankruptcy estate. Specifically, § 541 in relevant part provides:
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all of the following property, wherever located and by whomever held:
(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case....
Both the Senate and House reports to the Bankruptcy Reform Act confirm that Congress intended "property of the estate" to be interpreted broadly, inclusive of the definition of "property of the estate" under prior law which included title to property *274 as property of the estate.[9] According to these reports, the bankruptcy estate under § 541
... is comprised of all legal or equitable interest of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property currently specified in section 70a of the Bankruptcy Act.... The debtor's interest in property also includes `title' to property, which is an interest, just as are a possessory interest, or leasehold interest, for example.
SENATE COMMITTEE ON THE JUDICIARY, BANKRUPTCY REFORM ACT OF 1978, S.REP. No. 989, 95th Cong., 2d Sess. 82 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 5868; HOUSE COMMITTEE ON THE JUDICIARY, BANKRUPTCY REFORM ACT OF 1978, H.REP. No. 595, 95th Cong., 2d Sess. 367 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 6323. See 4 L. King, Collier On Bankruptcy, ¶ 541.01. pp. 541-6 (15th ed. 1991) ("The debtor's interest in property [which becomes property of the estate under § 541] also includes title to property.")
Both Congressional reports state, inter alia, that "[o]nce the estate is created, no interests in property of the estate remain in the debtor." S.REP. No. 989, 95th Cong., 2d Sess. 82-84 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 5868-5870; H.REP. No. 595, 95th Cong., 2d Sess. 367-369 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 6323-6325. See United States v. Whiting Pools, Inc., 462 U.S. 198, 204-205, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) (reviewing the legislative history of § 541 and noting the broad scope of § 541); In re Zachman Homes, Inc., 83 B.R. 633, 637 (Bankr.D.Minn.1985) (legislative history supports the conclusion that under § 541 "... all legal interests are sufficient to classify property as property of the estate. ..."); In re Ridenour, 45 B.R. 72, 74 (Bankr.E.D.Tenn.1984) (Congress intended § 541 to "... broaden considerably the scope of the definition of property of the estate under prior law."); In re Wright, 39 B.R. 623, 625 (D.S.C.1983), affirmed, 751 F.2d 714 (4th Cir.1985) ("... case law supports an expansive reading of [§ 541]....") (citations omitted).
In support of the defendants' position that neither the bankruptcy estates nor the trustee on their behalf held title to the allegedly stolen monies and therefore no property could be alleged to have been "stolen" for purposes of § 2314, Knoll cites In the Matter of Spain, 55 B.R. 849, 854 (Bankr.N.D.Al.1985). In Spain, the bankruptcy trustee filed an adversary proceeding against the debtor's wife, seeking to sever the joint tenancy between the debtor and his wife. The trustee sought to apply the proceeds of a sale of the couple's house to the debtor's bankruptcy estate. Initially, the bankruptcy court confronted the issue of whether the trustee, by operation of the debtor's Chapter Seven bankruptcy petition, could assert the debtor's interest in the joint tenancy with a right of survivorship, so that the trustee could then sever the joint tenancy. Concluding that the debtor's bankruptcy petition did not by operation of law transfer the debtor's interest in the joint tenancy to the trustee, the Court commented that upon filing a bankruptcy petition:
[t]he debtor does not transfer his title to 541 property of the estate but holds his title subject to the exercise by the trustee of his rights to sell, use or lease such property by appropriation under the `avoidance' or `strong arm' sections as typified by Sections 542, 543, 544, 545, 546 and 547 of the 1978 Act, as amended. The debtor retains the full use, possession and enjoyment jointly with the trustee and the right to refuse to turn over or deliver such property in proper cases. *275 There is no voluntary or involuntary transfer of property upon filing. It may never take place at the option of the trustee and never occurs as wholly exempt property.[10]
Although this statement in Spain is not supported by § 541's legislative history, and therefore is of diminished significance, even if, as the defendants argue, the filing of the petitions did not vest the estate with title to the monies allegedly transferred to the Cayman Islands by the defendants, this Court concludes that the estates had an interest in the monies which had the attributes of an ownership interest.
Once the debtor has filed a bankruptcy petition in either Chapters Seven or Eleven, the debtor simply cannot move or otherwise dispose of property of the estate at will under any circumstance. The bankruptcy code places potent restrictions on the debtor's ability to transfer, post-petition, property which has become property of the estate under § 541. See, e.g., 11 U.S.C. § 544 (voidable transfers), 11 U.S.C. § 549 (trustee's avoidance of post-petition transfers). Moreover, 11 U.S.C. § 363 affords the trustee broad power to use, sell or lease property of the bankruptcy estate in bankruptcies under Chapters Seven or Eleven.
Based on the legislative history of § 541 indicating the broad scope of property interests included within property of the estate, the expansive language of § 541 consistent with its legislative history, together juxtaposed to related provisions contained in the bankruptcy code which limit the debtor's ability to transfer or dispose of property of the estate post-petition, this Court concludes that the conduct charged in Counts Thirty-Five through Forty-Six of the indictment alleges that the defendants deprived the bankruptcy estates, or the trustee thereof, of "... property interests that are `tantamount to ownership,'" United States v. Bennett, 665 F.2d at 22, or property from "... one having the attributes of an owner." United States v. Carman, 577 F.2d 556 at 565. Therefore, this Court holds that the § 2314 counts of the indictment are legally sufficient.
Finally, this Court addresses three additional points. First, while it is true that 18 U.S.C. § 152 prohibits concealment of assets from creditors in bankruptcy, in enacting § 2314, Congress targeted the specific evil of interstate fraud. See Moskal v. United States, ___ U.S. ___, 111 S.Ct. 461, 468, 112 L.Ed.2d 449 (1990) (noting that § 2314 should be construed broadly as consistent with Congress' "... general purpose to combat interstate fraud.") (citations omitted). Therefore, this Court views alleged concealment of assets in bankruptcy through means of interstate transportation in accordance with the terms of § 2314 to be separate from counts Two through Five, charging violations of 18 U.S.C. § 152.
Second, at oral argument, Knoll argued, as an additional ground, that this Court must dismiss Counts Thirty-Five through Forty-Six under the holding in Dowling v. United States, 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985). In Dowling, reversing a § 2314 conviction where the indictment charged the defendant with interstate transportation of "bootleg" records manufactured and distributed absent consent of a copyright holder, the Supreme Court held § 2314 inapplicable to the conduct of copyright theft, conversion or fraud. In support of its decision, the Court relied on the plain language of § 2314, cited the statute's legislative history and particularly emphasized the peculiar nature of copyright law. As the Second Circuit has since commented, the crux of the Dowling holding is that § 2314 "... does not apply to wholly intangible property interests such as those possessed by a copyright holder." United States v. Wallach, supra, 935 F.2d at 467 (§ 2314 counts not legally insufficient under Dowling).
In this case, the defendants are charged with transporting monies, tangible property, across state lines. For the same reasons *276 which the Second Circuit recently identified in Wallach, this alleged conduct is plainly within the scope of § 2314. Therefore, this Court rejects Knoll's contention that the § 2314 counts must be dismissed under Dowling.
Third, the government cites United States v. Cardall, 885 F.2d 656 (10th Cir. 1989), and United States v. Goodstein, 883 F.2d 1362 (7th Cir.1989), for the proposition that "... a [§ 2314] charge may be based on a fraudulent transfer of assets of a debtor in bankruptcy." Although in Cardall and Goodstein the Tenth and Seventh Circuits, respectively, affirmed convictions under § 2314 and 18 U.S.C. § 152, those decisions do not indicate that the property subject to the § 2314 counts constituted property which the defendant knew was stolen, converted or taken by fraud from creditors in bankruptcy, as the indictment in this case alleges. Therefore, this Court does not rely on those case in rendering this decision.
Therefore, this Court denies the defendants' motions to dismiss Counts Thirty-Five through Forty-Six of the indictment.

VI. The Defendants' Motions To Exclude Foreign Bank Records From Evidence

The defendants seek an Order from this Court excluding as evidence certain bank records from Barclays Bank International, Ltd. Grand Cayman, Cayman Islands ("the Records").[11]
According to the government, the Records "... were obtained with the assistance of the Office of International Affairs, U.S. Department of Justice, pursuant to a Gentlemen's Agreement with the Cayman Islands." The Gentlemen's Agreement is confidential and, therefore, has not been disclosed to the public.
On February 22, 1990, the government filed the indictment in this case. On February 27, 1990, the government timely noticed the defendants of its intent to offer the Records into evidence at trial pursuant to 18 U.S.C. § 3505 ("§ 3505").
The defendants challenge the admissibility of the Records on three grounds: 1) that admission of the Records under § 3505 is improper because it would deny the defendants their Sixth Amendment right to confrontation; 2) the foreign certification accompanying the Records is insufficient under § 3505(c)(2); and 3) the Records were improperly released in violation of the Gentlemen's Agreement as well as under Caymanian law. Knoll also requests that this Court order the United States government to issue Letters Rogatory so that Knoll may depose the individual(s) responsible for certifying the Records.
The Court shall address each issue in turn.
18 U.S.C. § 3505 ("§ 3505"), enacted as part of the Comprehensive Crime Control Act of 1984, addresses hearsay and authentication issues which arise in connection with the admission of foreign records into evidence. Specifically, § 3505 provides:
(a)(1) In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that
(A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
(B) such record was kept in the course of a regularly conducted business activity;
(C) the business activity made such a record as a regular practice; and
(D) if such record is not the original, such record is a duplicate of the original;
unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness.

*277 (2) A foreign certification under this section shall authenticate such record or duplicate.
(b) At the arraignment or as soon after the arraignment as practicable, a party intending to offer in evidence under this section a foreign record of regularly conducted activity shall provide written notice of that intention to each other party. A motion opposing admission in evidence of such record shall be made by the opposing party and determined by the court before trial. Failure by a party to file such motion before trial shall constitute a waiver of objection to such record or duplicate, but the court for cause shown may grant relief from the waiver. (c) As used in this section, the term
(1) "foreign record of regularly conducted activity" means a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, maintained in a foreign country;
(2) "foreign certification" means a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the law of that country; and
(3) "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
Congress enacted § 3505 "... to create `a simple, inexpensive substitute for the cumbersome and expensive procedures presently required for the admission of foreign business records.'" United States v. Strickland, 935 F.2d 822, 830 (7th Cir. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991) (quoting United States v. Hing Shair Chan, 680 F.Supp. 521, 523 (E.D.N.Y.1988) (citing H.Rep. No. 907, 98th Cong., 2d Sess. 3 reprinted in 1984 U.S.C.C.A.N. 3182, 3578, 3580).

A. Sixth Amendment Right To Confrontation
The defendants argue that admission of the Records into evidence pursuant to § 3505 denies them their Sixth Amendment right to confront witnesses against them. As have the other federal courts, See, e.g., United States v. Miller, 830 F.2d 1073 (9th Cir.1987); United States v. Chan, supra, 680 F.Supp. at 522-524, this Court rejects the defendants' argument.
The Sixth Amendment right to confrontation is not absolute. United States v. Davis, 767 F.2d 1025, 1031 (2d Cir.1985) ("It is well established that the Confrontation Clause does not preclude the admission of all extra-judicial statements when the declarant is not present at trial.") To be admitted into evidence despite a Confrontation Clause objection, "... the statement must bear sufficient indicia of reliability to assure an adequate basis for evaluating the truth of the declaration." Id. at 1032; Ohio v. Roberts, 448 U.S. 56, 65-66, 100 S.Ct. 2531, 2538-39, 65 L.Ed.2d 597 (1980) (declarant's unavailability does not render declaration unconstitutionally inadmissible if statement bears "... indicia of reliability."); United States v. Strickland, 935 F.2d 822, 830-831 (7th Cir.1991) ("§ 3505 did not change the benchmark question in this and every situation involving the admission of documentary evidence: do the documents bear the indicia of reliability?)
Therefore, this Court examines the reliability of the Records.

i. The Defendants' Evidence Of Unreliability

Except for Knoll's conclusory assertions of the unreliability of the Records, discussed below, the defendants' reliability argument is really an attack on the government's foreign certification of the Records under § 3505.
Section 3505 not only contains foreign certification requirements geared to test the reliability of foreign records sought to be admitted into evidence but, by the statute's own terms, under § 3505(a)(2), "[a] foreign certification under this section shall authenticate such record...."
Section 3505 requires that, to be admitted as evidence despite the hearsay rule, a record must be accompanied by a foreign *278 certification with specified attestations. The certification requirement of § 3505 is contained at subdivision (c)(2). Section 3505(c)(2) defines foreign certification as
... a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the law of that country.
In this case, the Records are accompanied by two documents which contain statements relative to certification of the authenticity of the Records: 1) a document entitled "Certificate Of Authenticity Of Business Records" ("the Certificate"), dated August 10, 1988 and unwitnessed; and 2) a document entitled "Affidavit With Respect To Documents Of A Regularly Conducted Business Activity ("the Affidavit"), dated January 27, 1989 and witnessed by a Notary Public. Both documents were signed by Garry John Wilkins, the sworn record custodian ("the record custodian"). The defendants argue that the Certificate and the Affidavit, when viewed together, fail to meet the requirement of § 3505(c). This Court disagrees.
The Certificate includes a statement by the record custodian that:
I, GARRY JOHN WILKINS, attest on penalty of criminal punishment for false statement or false attestation that I am employed by BARCLAYS BANK PLC and that my official title is Acting Manager. I further state that each of the records attached hereto is the original or a duplicate of the original records in the custody of BARCLAYS BANK PLC. I further state that:
A) such records were made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
B) such records were kept in the course of a regularly conducted business activity;
C) the business activity made such records as a regular practice; and
D) if such record is not the original, such records [sic] is a duplicate of the original.
The defendants challenge the Certificate as insufficient under § 3505(c)(2) because the record custodian failed to aver that "... the making of false statements would subject him ... to criminal sanctions ..." under the laws of the Cayman Islands. The defendants also argue the Certificate is deficient because it contains no "... documentation as to what such penalties, if any, might be." The defendants argue that the omission of this information renders the Certificate "... null and void."
This Court rejects the defendants' attack on the Certificate. First, § 3505(c) on its face does not require the foreign record custodian to declare that a falsely made statement would subject him to liability in his own country. Section 3505(c) simply requires that if the record custodian makes a false declaration, he would be subject to criminal penalty according to the law of his country. That requirement is met here and, in fact, the Certificate contains a statement to this effect. Second, contrary to the defendants' assertion, § 3505 contains no requirement that the foreign certification mention which penalties the record custodian would face for the making of a false statement. Therefore, this Court does not find the Certificate null and void for omission of this information.
The Affidavit, though more detailed, contains much of the same information as the Certificate. It states, inter alia, that the record custodian's responsibilities included supervision over the Records, that the bank maintained the Records in the ordinary course as part of the business routine, and that entries on the Records were made contemporaneously with the matters recorded. The Affidavit briefly contains a general summary of the Records.
The defendants attack the Affidavit on the grounds that it fails to specify whether the record custodian "swore," or "affirmed," to the statements therein and whether the record custodian's swearing or affirmance was made "on penalty of perjury" or "on the [record custodian's] oath." *279 The defendants also attack the affidavit on the grounds that the signature "purporting" to be the record custodian is illegible and that the signature of the witness to the record custodian's signature "... is illegible ..." and there is no indication of the witnesses name, position or address. For these reasons, the defendants contend that the Affidavit is unreliable.
Similarly, this Court rejects this attack on the affidavit. First, this Court does not find the Affidavit unreliable because the record custodian did not choose "swore" or "affirmed," or indicate whether his swearing or affirmance was made "on penalty of perjury" or "on the [record custodian's] oath." The record custodian did not delete any of the terms. It is possible, as the government contends, that because he deleted no terms, the record custodian intended all terms to apply. Second, this Court agrees with the government that the inability to read the record custodian's (or his witness') signature should not serve as a basis to disallow foreign records which meet the requirements of § 3505.
Viewing the two documents together, this Court concludes that the Certification and Affidavit constituted a sufficient foreign certification under § 3505(c)(2). Moreover, pursuant to § 3505(a)(2), a proper foreign certification authenticates the Records. The attestation by the record custodian pursuant to § 3505(c)(2) that he will be subject to criminal liability for a false certification affords the Records a sufficient degree of reliability. See United States v. Chan, supra, 680 F.Supp. at 523 ("The trustworthiness of the foreign certification depends essentially on the deterrent force of the criminal law of the foreign country.")
In addition to being accompanied by a proper foreign certification under § 3505, other indicia of reliability exist here. First, this Court agrees with the analysis in United States v. Miller, supra, 830 F.2d at 1077, that bank records are inherently reliable and a routinely used business record in judicial proceedings; because of the very nature of the banking business, banks have a strong interest in maintaining accurate records. Second, this Court also takes judicial notice of the fact that the Cayman Islands is a member of the United Kingdom, with business practices like those in the United States. See United States v. Chan, supra, 680 F.Supp. at 525 (Court took judicial notice of fact that Hong Kong is a British colony and thus records kept by a Hong Kong hotel were kept in accordance with standard Anglo-American business practice.).
In United States v. Miller, supra, 830 F.2d at 1077, the Ninth Circuit rejected the argument, which the defendants advance here, that admission of foreign bank records under § 3505 violated a defendant's sixth amendment right to confrontation. The Court said
[b]anks depend on keeping accurate records and although, as we all know, they err occasionally, their records are among the most common type of business record routinely used in our courts. The novelty of [§ 3505] is to admit the records without confrontation by the defendant with the recordkeepers. No motive is suggested that would lead bank officials to change, distort, or manipulate the records at issue here. The recordkeepers have, under criminal penalties in their own countries, asserted that the records are kept in the course of business. Examination of the recordkeepers by counsel for [the defendant] could not reasonably be expected to establish anything more or less than that.
See United States v. Strickland, supra, 935 F.2d 822 (Court rejected defendant's challenge to admission of § 3505 material on the grounds that the government failed to provide proper foreign certification under § 3505(c)(2)); United States v. Chan, supra, 680 F.Supp. at 522-526.
Finally, in support of his argument that the Records do not satisfy § 3505, Knoll has submitted two affidavits, signed by him, which in conclusory fashion state that the Records are unreliable. Knoll cites no facts or other reasons which indicate, in any way, that the Records are unreliable. For example, just as the Defendants' Motion does not, Knoll independently does not *280 indicate any motive or other reasons which might be harbored by the record custodian which would prompt a false certification of the Records. Similarly, Knoll cites no reason or offers no hint of support as to why Barclays, a large transcontinental commercial bank, would maintain unreliable records.

B. Improper Release Of The Records
Next, the defendants argue that this Court should deny admission of the Records into evidence because Barclays Bank improperly released the Records to the United States government. The defendants cite two grounds in support of this argument. First, the defendants argue that the Records were protected by "... confidentiality laws of the Cayman Islands ..." and that the defendants neither authorized the release of the Records nor waived any confidentiality rights they possessed pursuant to Caymanian law. In this regard, the defendants also contend that by releasing the Records, Barclays Bank breached a duty it owed the defendants. The defendants' second challenge to the release of the Records focuses on the so-called Gentlemen's Agreement ("the agreement") executed between the governments of the United States and the Cayman Islands. The defendants contend that the release of the Records constituted a breach of the agreement and, therefore, the Records should not be admitted into evidence at trial.
This Court rejects both arguments.
First, the defendants present no evidence of any agreement between them and the Barclays Bank or duty generally owed the defendants by the bank to support their claim that the bank breached any duty. In short, this Court simply finds no grounds stemming from any agreement with the defendants or other duty owed the defendants by Barclays Bank on which to deny admission into evidence of the Records in this case.
To the extent the defendants are arguing that the release of the Records constituted an illegal search and seizure in violation of the defendants' Fourth Amendment rights, this Court rejects this argument as well. The defendants, even as depositors, have no legitimate expectation of privacy in bank records. United States v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). Because bank records are the property of the bank, and not of the defendants, the defendants have no standing to challenge a seizure of the bank's records. See United States v. Payner, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (defendant lacked standing to suppress, on Fourth Amendment grounds, foreign bank records illegally seized from foreign bank).
Furthermore, the defendants cite no Caymanian secrecy laws or authority construing such laws. This Court doubts that any laws which exist in the Cayman Islands create for the defendants an expectation of privacy in this proceeding which is otherwise not recognized in the United States. See United States v. Payner, 447 U.S. at 732, n. 4, 100 S.Ct. at 2444, n. 4.
With respect to the defendants' contention that the release of the Records constituted a breach of the agreement, the defendants appear to be arguing that the United States government somehow induced the Cayman Islands government to assist the release of the Records unwittingly in violation of the agreement. Because the Caymanian government was requested to assist in the release of the Records pursuant to the agreement, this Court reasonably presumes that the Caymanian government would not comply with a request of the United States government outside the scope of the agreement. In any event, the defendants have absolutely no evidence to support their far-fetched theory. In fact, the defendants have not seen the agreement because it has not been disclosed to the public.[12]
*281 This Court, however, has reviewed in camera the agreement and the United States government's request for the Records made pursuant to the agreement.[13] This Court finds the United States government's request for assistance in obtaining the Records consistent with the terms of the agreement. The Records produced are also responsive to the United States government's request.
Therefore, this Court denies the defendants' motions to preclude from admission into evidence bank records from Barclays Bank International, Ltd. Grand Cayman, Cayman Islands.

C. Letters Rogatory
Knoll requests that this Court "... direct the [United States] government to issue Letters Rogatory to the Barclays Bank in the Cayman Islands...." Knoll makes this request so that he may secure depositions in order to cross-examine those who he claims have "... inaccurately certified ..." the Records.
This Court denies Knoll's request. Section 3505 provides for the admission of foreign records despite the hearsay rule where the foreign certification requirements of § 3505 have been met. Indeed, the certification requirements eliminate the need for confrontation of the record custodian. See United States v. Chan, supra, 680 F.Supp. at 523. By enacting § 3505, Congress did not intend "... to add technical roadblocks to admission of foreign records, but, rather, to streamline the admission of such records." United States v. Strickland, supra, 935 F.2d at 831. As discussed above, the certification requirements have been met in this case. This Court agrees with the Ninth Circuit's comment in United States v. Miller, supra, 830 F.2d at 1077, that
[t]he recordkeepers have, under criminal penalties in their own countries, asserted that the records are kept in the course of business. Examination of the recordkeepers by counsel for [the defendant] could not reasonably be expected to establish anything more or less than that.
Therefore, this Court denies Knoll's request that this Court order the United States government to issue Letters Rogatory.

VII. Knoll's Motion To Dismiss the Indictment Due To Pre-Indictment Delay

Knoll moves to dismiss the entirety of the forty six count indictment against him on the grounds of preindictment delay. This Court denies Knoll's motion.
Knoll argues that the government "... deliberately orchestrated ..." preindictment delay "... for the express purpose of gaining a tactical advantage and causing [him]" prejudice. Specifically, Knoll contends that the investigation leading to his indictment commenced in "... approximately May of 1983 ..." when the government began to pursue information about him. Knoll claims that "[d]uring the entire period from 1983 to date, [he has] been advised by a number of sources that the government had attempted to recruit them to `get Knoll.'"
Despite opportunity afforded by this Court in which to do so, Knoll has failed to provide this Court with even a modicum of evidence to support or substantiate his conclusory allegations. In short, there is no evidence before this Court that the government utilized preindictment delay "... as an intentional device to gain a tactical advantage over [Knoll] or that [delay] resulted in some specific prejudice ..." to Knoll. United States v. Vispi, 545 F.2d 328, 332 (2d Cir.1976) (citing United States v. Marion, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971)).
Therefore, this Court denies Knoll's motion to dismiss the indictment on the grounds of preindictment delay.

*282 VIII. Daniel Nowak's Request for Witness Fees

Daniel Nowak ("Nowak"), currently incarcerated in the Woodburne Correctional Facility, appeared as a witness for the defense at a suppression hearing in the above-captioned case. Pursuant to the letter request which Nowak made to this Court dated May 16, 1991, Nowak seeks an Order from this Court requiring that the government pay him witness fees pursuant to 28 U.S.C. §§ 1821 ("§ 1821") and 1825 ("§ 1825").
This Court denies Nowak's request.
Section 1821 must be read in conjunction with § 1825. Section 1825 authorizes the United States Marshal for the District to pay any fees of defense witnesses in two specific circumstances: 1) where the defendant is represented by a federal public defender; or 2) where the defendant is represented by assigned counsel appointed pursuant to 18 U.S.C. § 3006A. In this case, neither circumstance is present and, therefore, §§ 1821 and 1825 do not apply.
Moreover, in 1991 Congress enacted Pub.L. 102-27, Title II, Section 102, 105 STAT. 136, which provides that "notwithstanding 28 U.S.C. 1821 no funds appropriated to the Department of Justice in fiscal year 1991 or any prior fiscal year shall be obligated or expended to pay a fact witness fee to a person who is incarcerated testifying as a fact witness in a court of the United States, ..." except the fact witness fee decided in Demarest v. Manspeaker, ___ U.S. ___, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991).
Therefore, this Court denies Nowak's request for witness fees. This Court notes that recently Nowak filed a civil action in this District seeking the same fees. By Order filed with the Clerk of the Court November 25, 1991, this Court dismissed Nowak's lawsuit on the grounds that the issue of payment of such fees would be addressed instead in the above-captioned case. To the extent Nowak chooses to seek witness fees from a source other than the United States government, this Court hereby grants Nowak the opportunity to refile his civil case without the payment of filing costs.

IX. The Defendants' Motion To Suppress

The evidence which the defendants now seek to suppress is what has been marked for purposes of these motions as the government's exhibit 1 ("exhibit 1"). Exhibit 1 consists of various materials ("the materials")[14] which, as discussed below, were removed from Knoll's law office in 1986.
Consistent with its position throughout the proceedings on the defendants' motions, in July, 1991 the government filed an affidavit confirming that the only evidence which it seeks to introduce during its affirmative case at trial are two letters, emanating from the evidence marked as exhibit 1 but which have been separately marked for purposes of these motions as government exhibits 1A and 1B ("exhibits 1A and 1B"). Government exhibits 1A and 1B are requests from Knoll and Gleave as "Principals" of Atlantis International Ltd. to a Cayman Islands bank to wire transfer monies held in the account of Atlantis International Ltd.
The defendants move to suppress evidence on two grounds. First, the defendants argue that the government obtained the evidence in violation of the defendants' Fourth Amendment rights. Second, the defendants contend that admission of the evidence at trial would violate their Fifth or Sixth Amendment rights (the defendants do not specify with any more exactitude) because, according to the defendants, the government obtained the evidence in violation of the attorney-client privilege between Knoll and his clients, including Gleave.[15]
*283 In ruling on the defendants' motions, this Court has considered testimony from numerous witnesses which occurred from time to time over a period of months during a hearing on these motions, the briefs of all parties and oral argument held October 10, 1991.

A. Facts Relative To The Suppression Motion
Between the evening of June 28, 1986 and the early morning of June 30, 1986,[16] Knoll's law office located downtown on Niagara Street, Buffalo, New York was ransacked and volumes of materials were removed. (Transcript Of Proceedings Held Before The Hon. William M. Skretny ("T"), 7/18/91 at 137, 8/9/91 at 4). There appeared no signs of a forcible entry. (T, 7/18/91 at 145; defendants' exhibit 1).
On June 13, 1986, Timothy Ernle ("Ernle") was arrested for bank robbery.[17] Shortly thereafter, Ernle was incarcerated at the Erie County Holding Center (the "Holding Center") (T, 7/18/91 at 259). Ernle testified that while at the Holding Center he sought to make a deal on his bank robbery case. (T, 7/18/91 at 272). At the Holding Center Ernle ran into an acquaintance, Daniel Nowak ("Nowak"), a former employee of Knoll who held a vendetta against Knoll. (T, 7/18/91 at 259-261, 291). Ernle testified that he and Nowak agreed that Ernle might strike a deal with the government on his bank robbery arrest in exchange for incriminating materials which Nowak believed could be taken from Knoll's office. (T, 7/18/91 at 262, 275). Because Nowak had once worked for Knoll, Nowak knew which materials to take and where they were located within Knoll's office. (T, 7/18/91 at 309). Ernle testified that Nowak informed Ernle how to obtain the keys to Knoll's office, the office layout and "a general description" of what should be taken from Knoll's office. (T, 7/18/91 at 262, 286).
According to Ernle, an individual named Albert Hintenberger a/k/a "Chief" ("Hintenberger"), now deceased, on Ernle's request, committed a burglary of Knoll's office as a favor to Ernle. (T, 7/18/91 at 280-281). According to Ernle, by telephone from the holding center, he informed Hintenberger what to take from Knoll's office per Nowak's instructions. (T, 7/18/91 at 281-283).
Starting approximately August 1, 1986, Anthony Bruce ("Bruce"), then an attorney with the United States Department of Justice Strike Force in Buffalo,[18] received a series of collect telephone calls from Ernle while Ernle was incarcerated at the Holding Center on the bank robbery charge. (T, 1/24/91, at 10-13; 7/18/91, at 303). These conversations numbered approximately four or five. Before these telephone calls, Bruce did not know and had never heard of Ernle. (T, 1/24/91 at 37).
Ernle told Bruce that he had information regarding Knoll and others which Ernle might provide to Bruce as part of a deal to mitigate Ernle's circumstance stemming from the bank robbery charges. Bruce responded that he wanted to see hard information to support Ernle's claim. (T, 1/24/91 at 11; 7/18/91 at 313).
Although Bruce testified that at the time Ernle initially contacted him Ernle said that Knoll's office had already been burglarized and that Ernle had access to the materials taken, (T, 1/24/91 at 12), Ernle testified that he spoke with Bruce both before and after the files were removed from Knoll's office. (T, 7/18/91 at 302). In any event, *284 it is clear that Ernle indicated to Bruce from the first telephone conversation onward that he had access to materials taken from Knoll's office. (T, 7/18/91 at 303-304, 313).
Meanwhile, also after his bank robbery arrest and while incarcerated at the Holding Center, Ernle contacted his girlfriend, Patricia Devany ("Devany") (T, 8/9/91 at 83). Devany testified that Ernle wanted to use materials taken from Knoll's office to strike a deal with the government on the bank robbery charges. (T, 8/9/91 at 84). Devany testified that Ernle instructed her to retrieve the records from Hintenberger.
Devany testified that she retrieved approximately three boxes of records from Hintenberger and brought them to Ernle's sister's house. (T, 8/9/91 at 85). Devany testified that she was instructed which of the materials to deliver to the government, whereupon she examined the documentary materials and listened to the tape recordings; Devany further testified that she does not believe all of the materials which she examined were delivered to the government. (T, 8/9/91 at 86-89). Devany testified that she saw Ernle's sister examine the materials. (T, 8/9/91 at 87-88).
Devany made the first of three deliveries to Bruce of materials taken from Knoll's office. (T, 1/24/91 at 13). These materials constitute what has been marked as exhibits 1, 1A and 1B in connection with these motions. No search warrant was obtained by the government with respect to the materials delivered by Devany.
After reviewing the materials delivered by Devany, Bruce consulted Internal Revenue Service ("IRS") Agent John Quinn ("Quinn"). Bruce believed two documents, now exhibits 1A and 1B, might be evidence of criminal activity. (T, 1/24/91 at 30). Quinn saw no immediate tax implications but believed that FBI special agent Michael Vincent ("Vincent") might have an interest in the materials. (T, 1/24/91 at 14; 7/18/91 at 74-75).
Approximately five to six weeks after Ernle's initial telephone call to Bruce, Bruce turned the materials taken from Knoll's office over to Vincent. (T, 1/24/91 at 15, 21). Vincent testified that Bruce explained that the conversations which he had with Ernle implied that the materials stemmed from a burglary of Knoll's office. (T, 1/24/91 at 79). Subsequently, Vincent inventoried the materials. (T, 1/24/91 at 76; government exhibit 2).
On February 22, 1990, the government filed the indictment in this case which charges, inter alia, that exhibits 1A and 1B are overt acts in furtherance of the defendants' alleged conspiracy.

B. Gleave's Standing To Challenge The Search And Seizure Of Materials Taken From Knoll's Office
Initially, the government argues that Gleave lacks standing to object to a search and seizure of materials from Knoll's office on Fourth Amendment grounds. This Court need not and does not address this issue. For, even if Gleave has standing to so object, this Court finds no Fourth Amendment violation to have occurred in this case.

C. The Defendants' Fourth Amendment Claims
The defendants argue that a warrantless search and seizure of Knoll's law office violated their Fourth Amendment rights and, therefore, this Court must suppress all evidence stemming from the search and seizure of materials from Knoll's office. It is undisputed that the evidence which the defendants now seek to suppress was turned over to the government by a private individual.
Throughout the hearings on these motions, in their legal memorandum and at oral argument, the thrust of the defendants' motions to suppress has focused on their contention that the FBI, or other federal government entities, encouraged, designed or at least acquiesced in a burglary of Knoll's office which produced critical evidence leading to the defendants' indictment. Therefore, the defendants contend, the search and seizure of materials from Knoll's office must be measured by the Fourth Amendment. Because the government *285 did not obtain a warrant to seize Knoll's files but instead private individuals accomplished the seizure as agents of the government, the defendants argue, the seizure violated the defendants' Fourth Amendment rights and this Court must, therefore, suppress the evidence. As support for this theory the defendants emphasize, through hearing testimony, the government's prior contact with the alleged burglars of Knoll's office before the alleged burglary occurred.
Next, taking a somewhat different approach, the defendants argue that once the government had the materials in its possession knowing the materials were taken from Knoll's office, the government violated the defendants' Fourth Amendment rights by conducting a warrantless search of the materials.
The government, however, contends that, because the seizure of materials from Knoll's office was accomplished merely by private individuals absent any government involvement, no seizure protected by the Fourth Amendment occurred and therefore no search warrant was required. Next, the government argues that once the materials seized by private parties were in its possession, materials which had already been examined by third parties after the seizure, it was not required to obtain a warrant before searching the materials.
This Court now addresses each of these issues in turn.
The Supreme Court observed that the Fourth Amendment embodies
... two types of expectations, one involving `searches,' and the other `seizures.' A `search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A `seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property.
United States v. Jacobsen, 466 U.S. 109, 113-114, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). In this case, as noted above, the defendants attack both the search and seizure of materials from Knoll's office as violative of their Fourth Amendment rights.
The protections of the Fourth Amendment apply only to searches and seizures by the government. United States v. Jacobsen, 466 U.S. 109, 113-114, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) ("This Court has also consistently construed [the Fourth Amendment's] protection as proscribing only governmental action"). Concomitantly,
A wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully.
Walter v. United States, 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980) (citing Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921)).
In Burdeau, reversing the lower court, the Supreme Court held that incriminating documents unlawfully seized by a private party, without government involvement and delivered to the government to secure an indictment, were admissible into evidence at trial.
In that case, representatives of the defendant's former employer obtained books and papers of the defendant by breaking into his private office, desk, locked files and safes therein. The defendant's former employer then turned over incriminating documents to the Department of Justice, which used the documents as the basis for a grand jury investigation and subsequent indictment.
After noting that "... no official of the Federal Government had anything to do with the wrongful seizure of the petitioner's property or any knowledge thereof until several months after the property had been taken ...[,]" the Court found no Fourth Amendment search or seizure occurred. Id. at 475, 41 S.Ct. at 576. The Court concluded that the government could retain the incriminating documents which also could be admitted against the defendant at trial.
However, despite the Burdeau rule, the government may not avoid the strictures of the Fourth Amendment by *286 utilizing a private party to accomplish a search violative of the Fourth Amendment. Accordingly, where a private individual conducts a search or seizure as an agent or instrumentality of the government, the search or seizure is no longer considered "private" vis-a-vis the Fourth Amendment and, therefore, the search and seizure must be measured against the protections of the Fourth Amendment. Whether or not an otherwise private search becomes one subject to the Fourth Amendment depends, viewing all circumstances of the case, on whether the "private" individual who accomplishes the search and seizure does so as an instrument or agent of the government. Coolidge v. New Hampshire, 403 U.S. 443, 487-488, 91 S.Ct. 2022, 2048-49, 29 L.Ed.2d 564 (1971).
As has this Circuit as well as others, to determine whether the private searcher of Knoll's office acted as a government agent, this Court considers the defendants' showing that the government knew or at least acquiesced in the search and seizure and that the private searcher intended to assist law enforcement as opposed simply to achieve his own ends. United States v. Bennett, 709 F.2d 803 (2d Cir.1983), revised, 729 F.2d 923 (2d Cir.1984), cert. denied, 469 U.S. 1075, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984) ("`... there must be some degree of governmental knowledge and acquiescence.'") (citations omitted); United States v. Feffer, 831 F.2d 734, 739 (7th Cir.1987) ("... two critical factors in the `instrument or agent' analysis are whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purposes for conducting the search was to assist law enforcement efforts or to further her own ends."); United States v. Snowadzki, 723 F.2d 1427, 1429 (9th Cir.1984), cert. denied, 469 U.S. 839, 105 S.Ct. 140, 83 L.Ed.2d 80 (same) (and further citations therein).
In this case, the defendants retain the burden of demonstrating by a preponderance of the evidence that whomever took the materials from Knoll's office, they acted as an agent of the government. United States v. Feffer, supra, 831 F.2d at 739 ("... it is the movant's burden to establish by a preponderance of the evidence that the private party acted as a government instrument or agent.")

i. The Seizure Of Materials From Knoll's Office Was Purely Private And Therefore The Fourth Amendment Does Not Apply

Because this Court concludes that the seizure of materials from Knoll's office was accomplished by private individuals, not acting as agents of the government, this Court holds that the seizure did not violate the defendants' Fourth Amendment rights.

a. Evidence Of Government Involvement In The Seizure
In support of their argument that the individuals who removed the materials from Knoll's office did so as agents of the government, the defendants emphasize contact which Ernle had with the government before the period of June 28, 1986 to June 30, 1986, the dates between which materials were removed from Knoll's office.
The defendants' primary focus with respect to alleged government involvement in the seizure focuses on an interview between two FBI agents, John Culhane ("Culhane") and Stanley Amrozowicz ("the agents"), and Ernle which took place on June 16, 1986 at the Holding Center while Ernle was being held on the bank robbery charge. (T, 7/18/91 at 265; 8/9/91 at 92; government exhibit 35).
This meeting came as a response to a June 15, 1986 phone call placed by Devany to Culhane on Ernle's behalf. (T, 7/18/91 at 185, 201, 264; government exhibit 27). Devany told Culhane that Ernle wanted to talk about the bank robbery. Devany made no reference to Knoll. (T, 7/18/91 at 201). The meeting lasted approximately four to five hours. (T, 7/18/91 at 186, 268).
Ernle testified that during this interview, the agents made a "verbal deal" on his bank robbery charge in exchange for information regarding the bank robbery and Knoll. (T, 7/18/91 p. 276). Ernle also testified that he gave the agents information *287 concerning Knoll's clients, including Gleave, and Knoll's files. Ernle claims to have discussed Knoll with the agents for about one hour and forty-five minutes. (T, 7/18/91 at 268). Ernle further testified that he told the agents that he had access to materials from Knoll's office and that the agents were interested. (T, 7/18/91 at 267). Ernle testified that as of the June 16, 1986 meeting, he already had the materials taken from Knoll's office. (T, 7/18/91 at 277-278).
Culhane, however, adamantly testified that Knoll was never even mentioned at the June 16, 1986 meeting. (T, 8/9/91 at 93). Moreover, Culhane testified that during the interview, Ernle never mentioned a burglary of Knoll's office (T, 7/18/91 at 193).
Government exhibit 35 consists of Culhane's original handwritten notes taken during his interview of Ernle on June 16, 1986. Although these notes reflect numerous subjects of alleged criminal activity referred to by Ernle, there is no reference to Knoll. Culhane's testimony is consistent with this fact. Culhane testified that had Ernle spoke of Knoll at that meeting, Culhane would have memorialized it in writing as he had other subjects. (T, 8/9/91 at 94). Government exhibit 28 is an FBI form FD-302 ("302 report") which is a recorded version of the June 16, 1986 interview. Consistent with Culhane's handwritten notes, nowhere does government exhibit 28 mention Knoll.
Culhane, however, had a telephone conversation with Ernle within weeks of the June 16, 1986 interview wherein Ernle discussed materials taken from Knoll's office. (T, 7/18/91 at 186-188). Ernle telephoned Culhane collect from the Holding Center. Culhane testified that during the telephone conversation, Ernle stated that his girl-friend, Devany, had documents of Knoll's obtained in "... some sort of break in." (T, 7/18/91 at 187). Culhane testified that he referred Ernle to Bruce, a Strike Force attorney, because as an agent assigned to narcotics matters, Culhane "... had no interest in ..." the subject matter of white collar criminal activity. (T, 7/18/91 at 188; 8/9/91 at 99). Culhane did not prepare a 302 report based on his telephone conversation with Ernle. (T, 7/18/91 at 196).
In support of their argument that the government knew of the "burglary" of Knoll's office before it occurred, the defendants focus on the government's exhibit 29, an internal memorandum authored by Vincent, dated March 27, 1987.
Vincent's memorandum initially refers to the June 16, 1986 interview of Ernle at the Holding Center by agents Culhane and Amrozowicz in connection with the bank robbery to which Ernle was charged. The memorandum then states that in the course of the interview, Ernle informed the agents that "... he had access to documents and tape recordings belonging to Attorney DAVID KNOLL." If Vincent meant what he wrote, his statement would indicate that on June 16, 1986 FBI agents had knowledge of a "burglary" which did not occur until at least June 28, 1986.
However, Vincent testified that his March 27, 1987 memorandum contains an error with respect to the date at which Culhane heard from Ernle that Ernle had access to materials taken from Knoll's office. (T, 8/9/91 at 111-112). Culhane also testified that in Vincent's March 27, 1987 memorandum, Vincent made a mistake because Ernle did not mention Knoll's name to the agents at the June 16, 1986 interview; that it was only during Culhane's telephone conversation with Ernle subsequent to the June 16, 1986 interview of Ernle that Culhane first learned of materials taken from Knoll's office. (T, 7/18/91 at 192-193, 200).
Vincent testified that he prepared the March 27, 1987 memorandum "[j]ust to memorialize the conversation" he had with Culhane. (T, 8/9/91 at 110-111). Vincent testified that the thrust of the conversation was whether Culhane had ever interviewed Ernle. Culhane answered that he had, on June 16, 1986. (T, 8/9/91 at 113). According to Vincent, although Culhane informed him of a meeting with Ernle on June 16, 1986, Culhane did not mention the subsequent telephone conversation which Culhane had with Ernle wherein Ernle first mentioned having access to Knoll's files. *288 Vincent testified that he simply attributed the information which Ernle provided to Culhane regarding Ernle's access to materials taken from Knoll's office to the June 16, 1986 interview. (T, 8/9/91 at 113).
Vincent also testified that he did not learn of the date of June 16, 1986 until Culhane told him, just before Vincent prepared the March 27, 1987 memorandum. (T, 8/9/91 at 120). Vincent further testified that he did not even learn of the materials actually taken from Knoll's office until they had been delivered to Bruce by Devany. (T, 8/9/91 at 122).
Culhane similarly testified that his conversation with Vincent with respect to Ernle and materials taken from Knoll's office occurred long after Culhane's telephone conversation with Ernle. Culhane testified that the subject of whether Ernle had ever mentioned Knoll arose just in passing with Vincent. (T, 8/9/91 at 99).
Culhane testified that Government exhibit 29 is the only document which references the subject matter of Culhane's telephone conversation with Ernle regarding Ernle's claims to have access to materials taken from Knoll's office. (T, 8/9/91 at 98).
This Court finds that the testimony of agents Culhane and Vincent, read together with Culhane's handwritten notes and the 302 report memorializing the June 16, 1986 interview with Ernle, defeat the defendants' contention that the government knew of a "burglary" of Knoll's office on June 16, 1986, before any materials were removed from Knoll's office. Logically, this Court finds that had Ernle mentioned Knoll to the agents on June 16, 1986, Culhane would have documented Knoll's name, or at least the subject matter of conversations regarding Knoll, in his handwritten notes or in the 302 report, just as Culhane documented numerous other names and subjects. In so finding, this Court finds Ernle's testimony regarding the length of time he spoke to the agents about Knoll on June 16, 1986 incredible, and this Court discounts it.
Moreover, the testimony of Vincent and Culhane is consistent, and offers a credible and logical reason why Vincent's March 27, 1987 memorandum incorrectly lists the June 16, 1986 date as the time Ernle mentioned Knoll to Culhane. The testimony establishes that the subject of Knoll was mentioned in passing between Vincent and Culhane well after Culhane spoke to Ernle over the telephone. Because Culhane never mentioned to Vincent a separate telephone conversation which he had with Ernle, one which Culhane had passed off to Bruce, Vincent mistakenly attributed Culhane's information to the June 16, 1986 interview. The defendants have provided this Court zero evidence, or credible contradictory testimony, to lead this Court to any other reasonable, and supportable, conclusion.
Therefore, this Court concludes that the defendants have simply not proven by a preponderance of the evidence that whomever removed the materials from Knoll's office did so as an agent of the government.
Finally, this Court addresses the testimony of Nowak, whom the defendants called as a witness at the hearing on these motions. Nowak has spent most of his adult life in jail for various crimes, primarily crimes of deceit. Some of these crimes were committed against clients of Knoll's. Nowak's present residence is the Woodburne Correctional Facility.
At the hearing, Nowak detailed a series of "facts" and events, many of which this Court finds incredible. The thrust of Nowak's testimony is that the government sought to use Nowak to obtain incriminating information about Knoll. At the conclusion of his testimony, Nowak made a last ditch effort to recant his testimony in full. This Court denied Nowak's attempt because Nowak did not make a proper recantation. Most of Nowak's testimony was uncorroborated. In fact, much of it has been expressly refuted by individuals whom Nowak claims he met with or spoke to.
For example, Nowak testified that in May, 1986, FBI agent Paul Cassidy ("Cassidy") took Nowak from the Holding Center to meet with Peter Broderick ("Broderick"), the Niagara County District Attorney, *289 at which meeting Nowak, Cassidy, Broderick and "... several other agents ..." discussed Knoll. (T, 3/18/91 at 39). Broderick testified that he never attended a meeting with Cassidy regarding Knoll. (T, 7/18/91 at 17). Cassidy testified that he never removed Nowak from the Holding Center and such meeting never took place. (T, 6/10/91 at 37).[19]
Nowak testified that Niagara County investigator William Patti administered a lie detector test at the meeting with Broderick and others. (T, 3/18/91 at 40). Patti does not recall ever attending a meeting involving Cassidy and Nowak. (T, 7/18/91 at 50).
Nowak also testified that after leaving the meeting with Broderick, Cassidy and other agents took him out for dinner and asked for the specific location of files in Knoll's office. Nowak further testified that, after dinner, the agents pulled Nowak in front of Knoll's office and questioned Nowak about entry into Knoll's office. (T, 3/18/91 at 47-52.) Cassidy testified that such events never took place. (T, 6/10/91 at 38-41).
Nowak testified that in May or June of 1986 he met with Assistant Erie County District Attorney Ernest Anstey ("Anstey") and First Assistant United States Attorney Roger Williams ("Williams") at which time Nowak was asked about the location of various records of Knoll's. (T, 3/18/91 at 40). Anstey testified that no such meeting occurred. (T, 3/18/91 at 70). Although not asked directly whether the meeting occurred Williams testified that he never has had personal contact with Nowak. (T, 7/18/91 at 101.)
Nowak testified that he dialed a collect call to United States Attorney Dennis Vacco ("Vacco") where Ernle spoke to Vacco about Knoll. (T, 3/18/91 at 55-56). Vacco testified that he never received such a call. (T, 7/18/91 at 249). Vacco's telephone records support his testimony. (government exhibit 26).
Nowak, whom this Court believes, based on his testimony and also documentary evidence before this Court (see government exhibit 12), holds a grudge against Knoll, offered similar incredible, uncorroborated and contradicted testimony; testimony which this Court need not recite further.
In short, this Court concludes that Nowak's testimony adds nothing to the defendants' case.

B. The Government Did Not Commit An Unlawful Search Of Materials Seized By Private Parties From Knoll's Office
The defendants next contend that after receiving the materials from Devany, the Fourth Amendment required the government to obtain a search warrant before examining the materials. This Court disagrees.
Following the reasoning of Burdeau, in United States v. Snowadzki, supra, 723 F.2d 1427, a case which the government in this case relies upon, upholding the defendant's conviction on two counts of filing false tax returns, the Ninth Circuit affirmed the district court's denial of the defendants' motions to suppress evidence. The defendant claimed, as have the defendants in this case, that a private individual who unlawfully seized log books from the defendant and delivered them to the government acted as a government agent, and therefore, the warrantless seizure and subsequent warrantless search by the government violated the defendant's Fourth Amendment rights.
In that case, one of the defendant's coworkers notified the IRS that the defendant engaged in the resale of aircraft engines without reporting the income from such sales to the federal government. The coworker asked the IRS agent whether it would be helpful to the IRS to have the defendant's logbooks documenting the unreported engine sales and whether a reward *290 might be available, the agent responded affirmatively. Subsequently, the coworker, unbeknownst to and without consent of the defendant, and without other authority to do so, copied the logbooks from defendant and turned the copies over to the IRS. Id., at 1428-29. The logbook copies served as a basis for the defendant's subsequent conviction. Thus, in Snowadzki, as in this case, it was undisputed that the evidence was initially obtained unlawfully.
Initially, the Ninth Circuit concluded that the defendant's coworker did not act as a government agent when he handed copies of the logbooks to the IRS and, therefore, the warrantless seizure did not violate the Fourth Amendment. In so concluding, the Court cited the district court's findings that the IRS agent "`had nothing to do with where the records were going to be obtained or how they would be obtained.'" Id. at 1429-30. The Court also found, despite his desire for a reward, that the coworker acted absent government encouragement.[20]
More importantly, the Court dismissed the defendant's contention that the government conducted an unlawful Fourth Amendment search by reading the documents without a warrant once they were delivered to the government by the defendant's coworker. In so concluding, the Court rejected the defendant's argument, the same argument which the defendants advance in this case, that, under Walter v. United States, supra, 447 U.S. at 656, 100 S.Ct. at 2401, 65 L.Ed.2d 410, the government must first obtain a warrant before reading documents delivered to it after having been illegally seized by a private party.
The Ninth Circuit observed that
[m]any of the third party search cases have involved books, records or documents turned over to the government.... The courts have never indicated that the government conducts a `search' by reading documents in its possession.
Id., at 1430. See also United States v. Sherwin, 539 F.2d 1 (9th Cir.1976).
The defendants argue that based on Walter v. United States, supra, this Court must suppress exhibit 1.
In Walter, reversing the defendant's conviction, the Supreme Court, in a plurality opinion, held that federal agents must procure a search warrant before viewing obscene films accidentally delivered to an innocent third party by a private carrier and turned over to the government by the third party.
In that case, employees of the third party opened the packages and found individual containers of film inside; the labels on the film containers indicated the films to be obscene. Some of the film boxes were opened by employees in an attempt to view the films under the light. Shortly thereafter, the FBI was notified and retrieved the packages. Without obtaining a search warrant, FBI agents viewed several film reels. The films served as the basis for the defendants' convictions for interstate transportation of obscene films.
The defendants challenged their convictions on the grounds that the federal agents' warrantless search of the films violated their Fourth Amendment rights. Agreeing with the defendants, the Supreme Court reversed the convictions. Walter, however, remains distinguishable from the facts of this case.
First, the plurality focused on the facts that the evidence consisted of 1) a once sealed package and 2) a package consisting of materials implicating First Amendment protections. The plurality emphasized that
When the contents of the package are books or other materials arguably protected by the First Amendment, and when the basis for the seizure is disapproval of the message contained therein, it is especially important that [the warrant] *291 requirement be scrupulously observed.
Id., 447 U.S. at 655, 100 S.Ct. at 2401. The Court distinguished its previous holding in Burdeau on the grounds that in the case before it, the subsequent search of the package by the federal agents "... was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search." Id., 447 U.S. at 652, 100 S.Ct. at 2402. The plurality expressly declined to decide whether the Fourth Amendment warrant requirement would have applied had the employees viewed the films before the government. Id., 447 U.S. at 652, n. 9, 100 S.Ct. at 2402, n. 9.
As did the Ninth Circuit in Snowadzki, supra, under facts closely analogous to this case, this Court concludes that Walter does not apply to this case. This Court finds that the holding in Walter turned on the facts that the evidence in that case consisted of previously sealed packages containing materials arguably entitled to First Amendment protections.[21]
Moreover, this Court agrees with the government that even if Walter applies to the facts of this case, the government's search of the materials taken from Knoll's office was not more intrusive than the search of those materials already undertaken by private individuals. Devany testified that, after being instructed which of the materials to deliver to the government, she examined the materials and listened to the tape recordings. Devany further testified that she saw Ernie's sister examine the materials. Because Devany also testified that she does not believe all of the materials which she examined were delivered to the government, it is apparent that as least she undertook a close review of the materials to determine which should be delivered to the government and which should not. (T, 8/9/91 at 86-89). Devany's testimony stood uncontradicted.
Finally, this Court notes that at various times throughout the proceedings on these motions, the defendants seemingly[22] argued that because the materials delivered to the government by Devany (government exhibits 1, 1A and 1B) consisted in part of files of Knoll's clients, that the attorney-client privilege attached to the relevant materials. Next, the defendants argued that because the materials delivered to the government were protected by the privilege, the government was required to secure a warrant before searching the materials, even though the materials had already been examined by third parties after the seizure. Because, as discussed below, this Court finds that no attorney-client privilege existed over the relevant materials delivered to the government, this Court need not, and does not, address the argument of whether the allegation of privilege, by itself or combined with a search by those acting as agents of the government, triggered a warrant requirement.
Therefore, this Court denies the defendants' motions to suppress on Fourth Amendment grounds.

D. The Defendants' Attorney-Client Privilege Claim
The defendants move to suppress exhibit 1 on the grounds that the government violated the attorney-client privilege. Because exhibit 1 includes files of Knoll's clients (or former clients), this Court can only presume that the defendants are arguing that the government violated the attorney-client privilege belonging to Knoll's clients. Nowhere do the defendants clarify *292 just exactly whose privilege has been violated. In fact, neither in their legal memorandum nor during oral argument on these motions did the defendants explain their attorney-client privilege theory. The defendants appear to be asserting a blanket privilege over the entirety of exhibit 1.
The defendants' attempt to suppress the entirety of exhibit 1 on privilege grounds, however, is unnecessarily broad. Throughout this proceeding, the government's position has been that it only intends to offer exhibits 1A and 1B into its affirmative case at trial. In fact, the government filed an affidavit confirming its intent not to offer any of the evidence from exhibit 1 as part of its affirmative case at trial. (government affidavit, July 15, 1991, ¶ 3). As discussed herein, even if the government sought to introduce into evidence all of exhibit 1, the defendants' privilege argument fails. In any event, this Court treats the defendants' privilege argument as relating to exhibits 1A and 1B. Although an attorney may assert the privilege on a client's behalf, see Klitzman, Klitzman and Gallagher v. Krut, 744 F.2d 955, 960 (3d Cir.1984) (and citation therein), due to the defendants' unexplainable silence on this issue, this Court must assume that with respect to exhibits 1A and 1B either Gleave is asserting the privilege or that Knoll is asserting it for him.
Recently the Second Circuit observed:
The attorney-client privilege generally forbids an attorney from disclosing confidential communications that pass in the course of professional employment from client to lawyer.... The relationship of attorney and client, a communication by the client relating to the subject matter upon which professional advice is sought, and the confidentiality of the expression for which the protection is claimed, all must be established in order for the privilege to attach.
United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir.1989) (citations omitted). The person asserting the privilege has the burden of showing its existence. Id., at 244.
In this case, the defendants have not even made an attempt to make any of these showings with respect to any of the materials taken from Knoll's office. Instead, the defendants simply assert a blanket claim of privilege. Therefore, their claim of privilege must fail for that reason alone.[23] However, there exist separate reasons why the defendants' claim of privilege must fail.
First, exhibits 1A and 1B are not communications by one of Knoll's clients relating to the subject matter upon which professional advice is sought. Government exhibits 1A and 1B are each requests from Knoll and Gleave as "Principals" of Atlantis International Ltd. to a Cayman Islands bank to wire transfer monies held in the account of Atlantis International Ltd. They are simply nothing more than requests for a bank transaction in the course of the defendants' business.
Along these lines, there are related reasons why the privilege does not apply to exhibits 1A and 1B. First, the privilege does not apply to communications involving business transactions of the attorney and his client. United States v. Rosenstein, 474 F.2d 705, 714 (2d Cir.1973). As noted above, exhibits 1A and 1B emanate from the business dealings of Knoll and his "client" Gleave. The communications stemming from that transaction are not confidential communications passing from client to lawyer in the course of the lawyer's professional employment; or a communication by the client relating to the subject matter upon which professional advice is sought.[24]
Finally, this Court finds that even if exhibits 1A and 1B were covered by the *293 privilege, the crime fraud exception vitiates the privilege in this case. Communications made in furtherance of an ongoing crime are not protected by the attorney-client privilege. In re Grand Jury Subpoenas Duces Tecum, 798 F.2d 32, (2d Cir.1986). In this case, to overcome the privilege, the government need not show that the crime had actually been committed, but only that probable cause exists that exhibits 1A and 1B were made in furtherance of a crime. In re John Doe Corp., 675 F.2d 482, 491 (2d Cir.1982). This Court agrees with the government that it has shown probable cause in this case by virtue of the indictment which charges that exhibits 1A and 1B are acts in connection with a criminal conspiracy to commit crimes also contained in the indictment.
Therefore, because this Court concludes that the defendants have failed to demonstrate the existence of the privilege, this Court must deny the defendants' motions to suppress exhibits 1A and 1B (or exhibit 1) on the grounds of attorney-client privilege.
For the reasons set forth above, this Court denies the defendants' motions to suppress evidence.

CONCLUSION
This Court denies all the above motions for the reasons articulated.
NOTES
[1] This Decision and Order is a consolidation of several Decisions and Orders filed by this Court during October and early November, 1991, shortly before the commencement of a jury trial.
[2] In his legal memorandum, Knoll contends that Count One is multiplicitous because it charges Knoll with Conspiracy to violate four criminal sections and "... the government may only charge one crime in each count...." What Knoll is actually alleging, however, is that Count One is duplicitous. Although they are both rules of pleading, a multiplicitous indictment "... charges a single offense in several counts[,]" while a duplicitous indictment "... charges separate offenses in a single count." United States v. Duncan, 850 F.2d at 1108, n. 4. Here, Knoll alleges several offenses improperly charged in a single Count and, therefore, this Court treats Knoll's motion with respect to Count One as one to strike the Count for duplicity.
[3] Knoll's argument ignores the plain language of Counts Two and Six. Count Two charges a continuing offense while Count Six charges that Knoll continued to aid and abet Gleave to on or about May, 16, 1988both Counts within the five year limitations period which even Knoll argues applies.
[4] As do most other Counts in the indictment, Counts Nine through Thirty-Three also charge the defendants with having violated 18 U.S.C. § 2, the aiding and abetting statute. As discussed above, 18 U.S.C. § 2, is not a separate substantive crime but simply "... makes punishable as a principal one who aids or abets the commission of a substantive crime." United States v. Campbell, 426 F.2d 547, 553 (2d Cir. 1970). Therefore, this Court focuses only on the substantive crime of 18 U.S.C. § 1956.
[5] Section 1956(c) defines several key terms, some of which this Court will discuss below.
[6] The cited opinion addresses the issue of the propriety of exemplary and punitive damages and not the defendant's underlying liability.
[7] As discussed above, Count One charges the defendants with conspiracy to commit an offense against the United States under 18 U.S.C. § 371 and alleges several underlying offenses allegedly committed by means of the conspiracy, including violations of 18 U.S.C. § 2314.
[8] Although the bankruptcy proceedings stemming from the bankruptcy petitions filed on behalf of Gleave and 747 Kenmore were converted from Chapter Eleven to Chapter Seven on January 12, 1984, before the alleged transfers violative of § 2314 took place, the result here would be no different had no such conversion to Chapter Seven occurred. Bankruptcy Code sections 521 (defining a debtor's general duties), 541 (defining property of the estate) and 544 (upon commencement of bankruptcy case, trustee acquires rights and powers of debtor) apply to cases arising under either Chapter Seven or Chapter Eleven.
[9] Section 70(a) of the Bankruptcy Act, the predecessor of § 541 provided:

The trustee of the estate of a bankrupt and his successor or successors, if any, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is to property which is held to be exempt....
[10] Ultimately, finding that state law controlled the nature of the rights which the trustee might hold in the joint tenancy, the Court abstained from ruling, and directed the trustee to file suit in state court. Id., at 855.
[11] Based on representations of defense counsel at oral argument held by this Court December 18, 1990 and subsequently confirmed at a conference held by this Court on October 17, 1991, the defendants do not challenge the admissibility of certain Canadian bank records.
[12] The defendants submitted to this Court a copy of an "Agreement Concerning Obtaining Evidence From Cayman Islands With Regard To Narcotics Activity," in support of their argument that release of the Records was beyond the scope of the Gentlemen's Agreement between the United States and the Cayman Islands. However, the agreement which the defendants submitted to this Court is not the Gentlemen's Agreement. (Government Affidavit, October 18, 1991).
[13] This Court has placed these documents under seal for the remainder of all proceedings in this case.
[14] The materials consist of, inter alia, sundry documents, client files, tape recordings, canceled checks, correspondence and phone bills.
[15] As discussed below, the defendants assert a blanket claim of privilege over the entirety of the government's exhibit 1. Therefore, this Court cannot ascertain with precision which clients of Knoll's assert the privilege, if any.
[16] The incident occurred over a weekend. Although Knoll testified that the incident occurred on June 29, 1986 at approximately 1:30 a.m, (T, 8/19/91 at 4), this Court heard no evidence conclusively establishing the precise date and time which the incident occurred. According to a Buffalo Police Department Report which came as a result of Knoll having reported the incident, Knoll's office was nonforcebly entered between 4 p.m. June 28, 1986 and 8:30 a.m. June 30, 1986. (defendant's exhibit 1).
[17] Ernle is now incarcerated at Leavenworth Federal Penitentiary. He is serving a fifteen year sentence after his conviction for bank robbery.
[18] Mr. Bruce is presently an Assistant United States Attorney in Buffalo.
[19] While Cassidy did interview Nowak at the Holding Center with respect to Nowak possibly becoming an FBI informant, information which Nowak provided to Cassidy at that meeting, including information regarding Knoll, proved unverifiable. Consequently, all files opened as a result of this interview were closed as was Nowak's informant's file. (T, 6/10/91 at 35-36).
[20] In this case, the facts indicating government involvement in the alleged burglary of Knoll's office are less than in Snowadzki. Unlike Snowadzki, in this case there is no evidence that the government knew of a potential seizure before it took place and no rewards to private parties were mentioned.
[21] In Snowadzki, the Court also cited the fact that Walter contained no majority opinion.
[22] Unfortunately, this Court must use the qualifier "seemingly" to described what this Court has determined to be the defendants' argument. Although raising the attorney-client privilege as an argument in support of their motions, defense counsel failed to clearly articulate their theory at oral argument. Moreover, in their brief, the defendants' entire attorney-client privilege argument consists of the following statement:

With regard to the attorney/client relationship, and the numerous laws, statutes, rules, Judiciary regulations, and of course the Sixth Amendment of the Constitution.[sic] We believe the Court can take Judicial notice of the sanctity of the attorney/client privilege [sic] and apply that notice to the facts in this case.
[23] This conclusion would be the same even if the government sought to introduce the entirety of its exhibit 1 into evidence at trial. The defendants have made zero effort to show that the privilege attaches to anything taken from Knoll's office. In fact, Knoll testified that the privilege does not attach to some of the materials taken from his office. (T, 8/9/91 at 41-43).
[24] This Court further notes that exhibits 1A and 1B are communications to a third party and not communications between Knoll and his client Gleave, and therefore they lie outside the scope of the privilege for this reason as well.